[No. 30119.   Department Two.   April 4, 1947.]

ROY SINNOTT, *Respondent*, v. MARY LOUISE SINNOTT, *Appellant*.[1]

[1]Reported in 179 P. (2d) 305.

*A. J. Hutton* and *Marion Garland, Jr.,* for appellant.

*James O. Arthur,* for respondent.

JEFFERS, J.—This is an action for divorce instituted by Roy Sinnott in the superior court for Kitsap county, in February, 1946. Plaintiff's cause of action is based upon the following alleged acts of cruelty on the part of his wife, Mary Sinnott:

"That for more than twenty-six months last past, the defendant has treated the plaintiff in a cruel and inhuman manner, in this: that while plaintiff was in the United States Army in active service in the European Theater of Operations, the said defendant openly and notoriously associated with men other than the plaintiff, and has advised the plaintiff that she no longer cares for him and does not intend to resume marital relations."

In response to an order to make the complaint more definite and certain by setting forth the names of the men with whom defendant has so associated, plaintiff set out the following names: Matt Spamish, Don Florentino, Russ Stoner, and a man whose first name is Ray.

The prayer of the complaint is that plaintiff be awarded an interlocutory decree of divorce and the care, custody, and control of Norman LeRoy Sinnott, three-year-old son of the parties.

Defendant filed an answer and cross-complaint. In her answer, she denied the allegations of cruelty, and, by her cross-complaint, she alleged cruelty on the part of plaintiff. In the prayer, she asked for an interlocutory decree of divorce, the care, custody, and control of the minor son, alimony in the sum of fifty dollars per month, the further sum of thirty dollars for the care and support of the minor child, and one hundred fifty dollars for attorneys' fees.

The cause came on for trial before the court on June 14, 1946, and, at the conclusion of the case, the court stated:

"The court is convinced that both of the parties hereto should be granted a divorce. They have both proved sufficient grounds for divorce.

"I feel that the testimony of the defendant, Mary Sinnott, is not satisfactory on many points, especially the points concerning the question of burning the letters—her explanation of that.

"The court feels that the welfare of the child would best

be served if the child is placed in the custody of the father, and it is so ordered, subject to the right of the mother to visit at all reasonable times. The child may be with her on certain vacation periods, or at certain reasonable periods of time."

On July 1, 1946, the court made and entered findings of fact, conclusions of law, and judgment.

As the only basis for the conclusions of law to which we shall refer, and as the only basis to support plaintiff's allegations of cruelty, the court found:

"(5) That during the absence of the plaintiff while on military service with the Army of the United States in the European theater of operations, the defendant openly and notoriously associated with other men than the plaintiff; that during the said time the child of the parties was left with the mother of the defendant; that during the said time the defendant did not give to the said minor child adequate and proper care."

Conclusion of law No. 2 states:

"That the defendant is not a fit and proper person to have the care, custody and control of Norman LeRoy Sinnott, the minor child of the parties."

Conclusion of law No. 3:

"That the plaintiff is a fit and proper person to have the care, custody and control of the said minor child, and that the welfare of the said child would best be served by awarding the custody of the said child to the plaintiff, and that the defendant should have the right of reasonable visitation of the said child."

An interlocutory decree of divorce was granted to each of the parties, and the care, custody, and control of the minor son was awarded to plaintiff. Each of the parties was ordered to pay his own costs, except that plaintiff was ordered to pay the sum of one hundred fifty dollars to defendant's attorneys, with credit for one hundred dollars theretofore paid.

The errors assigned by appellant are in not finding that appellant is a fit and proper person to have the custody of her child; in refusing to award such custody to her; in permitting to be introduced in evidence a letter written to

appellant, but which was taken from the mail box by respondent and never shown to appellant; and in denying appellant's motion for a new trial.

There is no property involved in this action, except a baby bed and a claimed overpayment of income tax in the amount of one hundred forty-two dollars. The primary question to be decided is whether or not the trial court was justified by the evidence in awarding to respondent the care, custody, and control of the three-year-old boy. Incidental to the main question is the question of whether or not the court was justified in concluding that appellant is not a fit and proper person to have the care, custody, and control of the minor child.

■■ We appreciate and have in mind that the findings of the trial court are entitled to great weight, and we have in mind that the court saw and heard the witnesses. We are also mindful of the rule, announced many times by this court, that the welfare of the child is of paramount importance. There is another rule to be considered in connection with the one last stated, to wit, that a child of tender years will not be taken from its mother unless it is shown that she is an unfit and improper person to have its custody and control. See *In re Hansen,* 21 Wn. (2d) 695, 152 P. (2d) 712, where many cases are cited.

Before discussing the evidence which bears directly on the fitness of appellant or respondent to have the custody of this child, we desire to make a general statement relative to this marriage. Mr. and Mrs. Sinnott were married in Coeur d'Alene, Idaho, on May 31, 1942. At that time, appellant was about eighteen years of age. After the marriage, the parties lived for a short time in Spokane, where appellant's parents then lived and still reside. The parties next moved to Bremerton, Washington, where respondent worked in the shipyards, and they continued to live in Bremerton until August 4, 1943, when respondent entered the armed forces of the United States. The boy, Norman Sinnott, was born March 1, 1943.

After respondent entered the army, appellant took the child and what few personal effects the parties had and

went to Spokane to reside with her parents. She and the baby continued to live in her parents' home, with the exception of short visits to Butte, Montana, Walla Walla, and Pasco, until shortly after November 17, 1945.

Respondent was discharged from military service on the date last named and immediately went to Spokane. When he arrived in Spokane, he was informed that his wife was in a hospital and went to see her. Appellant in a few days left the hospital, and she and respondent continued to live with her parents. A few days thereafter, a quarrel arose between the parties, during which, appellant testified, respondent tore her clothes off, knocked her down, and kicked her. Respondent admitted that, on the occasion mentioned, he struck appellant and tore off her dress, or slip, but denied that he knocked her down or kicked her. Appellant's sister, Dorothy Wright, who came into the house during the quarrel above referred to, corroborated appellant's version of what happened.

About this time, respondent filed a complaint for divorce in Spokane county. This complaint, which was based upon the same grounds as the complaint in the case now before us, was either abandoned or dismissed, and the parties agreed to try living together again. Pursuant to this understanding, respondent was to go to Bremerton, get employment, and, as soon as he was established, send for appellant and the baby.

Respondent went to Bremerton on December 3, 1945, and started to work in the shipyards on December 5th. Appellant and the baby went to Bremerton about January 19, 1946. Appellant had been in Bremerton only a matter of days (as the complaint in this action was sworn to on January 28, 1946), when trouble again arose between the parties and finally culminated in a quarrel, during which, appellant stated, respondent again struck her and otherwise abused her. On the night of this last quarrel, the parties were going out to spend the evening, and the baby had been taken to respondent's mother.

The parties separated after this quarrel, and appellant went to Spokane, but immediately returned to Bremerton

and filed her appearance in this action. During this time, the baby remained in the home of respondent's parents.

On March 25, 1946, the court entered an order that the child remain in the custody of his father, pending a trial upon the merits. At the time of trial, the child was in the home of some friends of respondent, where respondent saw him two or three times each week. There is nothing in the record to indicate what the surroundings are in this home, and nothing to show what kind of care this little boy was receiving, other than that respondent stated he was being well cared for.

The only testimony in the case relative to appellant's association with men during the time respondent was in the service, comes from respondent. His testimony admittedly is not based upon any personal observation, or the observation of appellant's actions by any other witness, but is based solely and entirely upon what respondent stated appellant wrote to him in letters received while he was in Europe, and letters which he found in appellant's room at her mother's home after his discharge. None of these letters was introduced in evidence, it being respondent's explanation that they had been burned by appellant. According to respondent's testimony, he procured the letters from appellant's room in the following manner. Upon being asked on what he based the charge in his complaint, he stated:

"A. On those letters. Q. What letters are you referring to? A. Ones her mother gave me was in a pillow case. I asked my mother-in-law where my clothes was. We went upstairs to find them. This pillow case came open. Some were mine; some other men; some written to Spokane— Q. How many letters were there written to her by other men? A. I don't know how many. Q. Several? A. Lots of them—fifty at least, maybe seventy-five—I didn't count them. Q. Did you read those letters? A. I read some. Q. What in general did they contain? [Objection by Mr. Garland, Jr., overruled.] A. One letter was from Matt Spamish, address to her at 323 North Washington, Butte, Montana. Asked her please, why she didn't come to Spokane. She wasn't taking good care of herself. Wasn't getting attention he should have. One was from Don Florentino,

Sergeant, at Walla Walla Air Base, stating he couldn't come to Spokane, been drunk, walking down the highway, hit by a car."

The above is all that is stated relative to the contents of the letters which respondent found, and is the basis for his charge that appellant was openly and notoriously associating with other men.

Selma Lyons, appellant's mother, was called as a witness by respondent and testified in part as follows:

"Q. Did you ever see any letters which Mr. Sinnott showed to you written to your daughter by other men? A. Mr. Sinnott didn't show me any letters. He went through everything she had before she came home from the hospital. He didn't ask me to examine anything. He went upstairs and tore up everything, looking for something—I don't know what. Q. You never saw any letters? A. No. Q. Do you know if there were any letters? You can't say for sure? A. I know she never got any at my address, and she never had any other address. Q. Did he ever tell you he had these letters? A. No, he didn't exactly tell me he had letters. He said he had proof his wife wasn't true to him."

Appellant denied that she had associated with any man or men while her husband was in the service, and that she had been out with any man. She denied that she had received any letters from men other than her husband, while he was in the service. She admitted that, after she got out of the hospital, she and her husband burned certain letters they had received one from the other, but stated that she burned no letters from men other than her husband.

Appellant stated that she knew no man by the name of Spanish or Spamish, and that she had never received a letter from any such person. She admitted that she knew Russ Stoner, who was a friend of the family, but stated that she had had nothing to do with him, and that she had received no letter from him. Appellant admitted that she met Don Florentino at her aunt's home one evening when he came there to dinner; that, on this occasion, her aunt, uncle, her cousin and his wife, and Florentino were going to a dance, and she went with them. She denied that she had ever

gone out with Florentino, or that she had ever received a letter from him.

Mrs. Lyons also testified that, during the time appellant was living at her home, no man ever called at the home for appellant; that her daughter was not out much in the evening; that appellant never came home intoxicated and, so far as she knew, did not frequent beer parlors; that she looked after the baby during the time appellant was working. This witness further testified that appellant assisted her around the home, helped with the washing; that the child was given good care; that he received medical care when required; and that she was willing and able to make a home for appellant and the little boy. Mrs. Lyons further testified that she and her husband owned the large eleven-room home where they lived; that it was modern in every respect, with furnace heat, modern plumbing, and the other modern conveniences; that they had a large yard, with lawn and flowers.

Mrs. Dorothy Wright, appellant's sister, who was living at home a part of the time appellant was there, stated that appellant took good care of her baby; that she was usually at home evenings; that she had never known of any men calling for appellant; that appellant sometimes went out with her and her boy friend, but that appellant would have no man friend with her; that she did not know of appellant's going to beer parlors.

Respondent testified to appellant being in two beer parlors. It is admitted that she went into one just to see a girl friend and was not in there for more than five minutes, on an occasion when she and respondent were out walking. Respondent testified that, after their last quarrel, to which we have referred, he saw appellant in McGill's tavern in Bremerton. Appellant denied that she was ever in this tavern. There was also some testimony in regard to an address book belonging to appellant, with the names of men in it, but no such book was produced.

We have in this case the testimony of only one witness which might be said to be entirely disinterested, namely, that of Agnes Atkinson, who was called by appellant and

stated she had known appellant and her family about twelve years; that she had often visited in the Lyons home, and members of the Lyons family had visited in her home. She testified that the Lyons had a large, well-kept home, with beautiful grounds, lovely lawn, trees, and flowers; that the grounds were like a park.

It may be stated here that Mrs. Atkinson testified she had eight children. It may also be stated that Mrs. Lyons, appellant's mother, had seven children at home, in addition to appellant.

Mrs. Atkinson was asked the following questions relative to the children in the Lyons home:

"Q. Ever have occasion to see the children around the house? A. Yes, I do. Q. How are the children kept? A. They all have a fine, lovely time. I never saw children so well-behaved—get along so nicely. Q. How were they dressed? A. Neatly. Q. How was their demeanor—the children's demeanor—young children? A. Well, I have eight, and they are as nice as anyone can find. Q. You have eight, and they are as nice as your eight? A. Well, I might be prejudiced, but they are nice children. . . . Q. Did you ever notice if Mary did the laundry, or not? A. Yes, she always helped her mother at home. . . . Q. And you know Mary's reputation in the community for being a mother? A. Yes, she was always thoughtful of the baby. Q. And what is her reputation as a mother there in the community? A. Well, she has a good reputation. . . . Q. Is there anything wrong in any particular with her reputation? A. I have never heard anything against her."

This witness knew nothing of the trouble between appellant and respondent. She also stated that no men friends called on Mary while she was there, and that she never heard Mary speak of any.

Where in the record is the evidence of any open and notorious association with men, other than that of respondent? To be notorious a thing or condition must be generally known and talked of, widely or commonly known.

■ While we appreciate that much of the testimony in this case was given by interested witnesses, yet, after a consideration of the record, we are convinced that the evidence preponderates against the finding of the trial court that

during respondent's absence, while he was in the military service of the United States, appellant openly and notoriously associated with other men. We are also convinced that the evidence preponderates against the finding that during the time the child was with appellant and her mother, he did not receive adequate and proper care.

We are also of the opinion that the facts in this case do not justify conclusion No. 2, as made by the trial court, to the effect that appellant is not a fit and proper person to have the care, custody, and control of the minor child.

Considerable emphasis is placed by respondent on plaintiff's exhibit B, for the purpose of showing appellant did not want the child. We quote this exhibit:

"I'm leaving my husband because I don't *love* him and I want a divorce. I'm taking my personal belonging and that is all I want. Mr. Roy Sinnott is giving the money for me to leave at my request. That I can see my son Norman whenever I wish.

"I also ask for a divorce of Roy Sinnott on December 20, 1944, while he was in the service overseas.

"Sign (wife) Mary"

Respondent, on cross-examination, was asked the following questions in regard to the above statement:

"Q. Then at the time she signed this you sat her down, told her to write it? A. She wrote one I didn't approve of. Q. You sat her down and made her write the note? A. I did not sit her down. I went upstairs and told her it did not please me so she come back and wrote that. Q. You told her if she didn't she was going to get beat up? A. I did not—I knew she would say that in court. Q. You threatened it? A. I did not. Q. Ever call her names? A. I might have—got drunk—had a pretty good time, when I got back from overseas."

Appellant's version of what happened at the time this note was signed is as follows:

"Q. Now, at the time you left your husband, you testified you wrote here what is marked plaintiff's exhibit 'B', is that right? A. Yes. Q. Would you tell the court just what happened in the writing of plaintiff's exhibit 'B'? A. That's right after the second beating I got—it was right after he give me the beating, the second time—and I said, well, I

will go home, because I didn't know anything else to do. He told me I wouldn't have any money to do with, so I wouldn't be able to do anything about it. And he threatened me to write that note. Q. Did you write a note then, when he threatened you? A. Yes. Q. Is this the note you wrote? A. Yes. Q. Did you write one before that? A. Yes, I did. Q. What happened to it? A. Wasn't a note like he wanted—he dictated note word for word. Q. Did he dictate this note word for word? A. Yes. Q. Did you at any time intend to give him the child? A. No. Q. Other than in this note here, did you offer to give him your child? A. No."

While respondent's mother and father are undoubtedly estimable people, and Mrs. Sinnott indicated her willingness to take care of the child, at the time of trial the little boy had been placed by respondent with some of his friends, where, as stated, respondent saw him two or three times a week.

■ We appreciate that if the child is awarded to appellant, he will probably be kept in the home of her mother. We also appreciate that Mrs. Lyons has what would now be considered a large family. But, nevertheless, in view of all the facts in this case, as they appear to us at this time, we are of the opinion the welfare of this child will be best served by awarding him to the mother.

In so concluding, we are not holding that respondent is not a fit and proper person to have the care and custody of the little boy, although we are of the opinion the admitted conduct of respondent on some of the occasions shown by the record cannot be excused.

■ While we think appellant probably exaggerated some of the incidents testified to by her, we are unable to find in the evidence anything in regard to her testimony relative to the burning of letters which would seem to merit criticism. However, if we have misjudged appellant's good faith, or her desire to take this little boy and give to him the attention and care to which he is entitled, the decree to be entered may always be modified; and we have little doubt that the actions of appellant and the manner in which she cares for the child will be closely watched and scrutinized.

■ While, in view of the conclusions reached herein, it

is perhaps not necessary to refer to plaintiff's exhibit A, which is a letter written to appellant by a girl friend under date of January 31, 1946, we have decided to express our view of the admission of this letter in evidence.

The letter was taken from the mail box by respondent and never shown to appellant. She never saw the contents of the letter until it was offered in evidence. Objection to its introduction was made, but the court permitted it to be introduced. The general rule is stated in 32 C. J. S. 610, § 707, to be as follows:

"In order to render a letter or telegram or a copy thereof admissible against the addressee, it must be shown that it was received by him, or duly sent or delivered for transmission to him through the mails so as to raise the presumption, considered supra § 136, that it was received by him, or that it came to his attention. Similarly a letter addressed to one other than the party sought to be charged with knowledge of its contents cannot be admitted without sufficient proof that the contents were communicated to him."

The foregoing rule was approved by the court in *Fleishbein v. Thorne*, 193 Wash. 65, 74 P. (2d) 880.

We are of the opinion that, under the facts in this case, the trial court erred in admitting this letter.

Respondent has moved to dismiss the appeal, on the ground "that the appeal was not commenced within thirty (30) days as required by Rule of Court 5-1."

The rule referred to has no application to an interlocutory decree of divorce. Rem. Rev. Stat. (Sup.), § 988 [P.P.C. § 23-15], provides in part: "Appeals may be taken from such interlocutory order within ninety days after its entry." The interlocutory decree was filed July 1, 1946, and the notice of appeal was filed and served on September 9, 1946.

We having concluded that the evidence preponderates against the finding that appellant openly and notoriously associated with men other than respondent, the only ground of cruelty alleged in the complaint or attempted to be proved; respondent is not entitled to an interlocutory decree, and his complaint should be dismissed.

Appellant, under the admitted facts, is entitled to

an interlocutory decree of divorce on her cross-complaint. She is also entitled to a finding that she is a fit and proper person to have the care, custody, and control of her minor son, until the further order of the court.

The sum of approximately one hundred forty-two dollars due on income tax refund from the United States government should be awarded to respondent as his sole and separate property, as well as any sums which he may receive for past services in the army of the United States. The baby bed acquired by the parties for the use of their minor child should be awarded to appellant.

Respondent, at the time of trial, was earning $40.64 per week, after certain deductions. Appellant is capable of earning thirty dollars per week. In view of the situation here presented, we are of the opinion that respondent should pay to appellant the sum of fifty dollars per month to assist in the support of appellant and the minor child, such payments to begin on April 1, 1947. Respondent should also pay to appellant the sum of fifty dollars, in addition to the one hundred dollars already paid, as attorney's fees in the superior court, together with appellant's costs in that court and in this court.

For the reasons herein assigned, the judgment of the trial court is reversed and the cause remanded, with instructions to enter findings of fact, conclusions of law, and judgment in accordance with this opinion.

MALLERY, C. J., STEINERT, ROBINSON, and HILL, JJ., concur.